IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WESTERN WATERSHEDS ) <br> PROJECT, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> U.S. FOREST SERVICE, ) <br> ) <br> Defendant. ) <br> _____) | Case No. CV-07-151-E-BLW <br><br> **MEMORANDUM DECISION** <br> **AND ORDER** |

## INTRODUCTION

The Court has before it a motion for TRO and/or preliminary injunction filed by plaintiff WWP. The Court heard oral argument on May 3, 2007, and took the motion under advisement. Because the dispute now focuses on action that will not be taken until September of 2007, at the earliest, the Court finds premature the request for a TRO. The Court will set up an evidentiary hearing and rule on the preliminary injunction aspect of this case before the disputed action will occur in September or October of 2007. This decision is explained in more detail below.

## LITIGATION BACKGROUND

**1.    Summary of Positions**

**Memorandum Decision and Order – Page 1**

Plaintiff WWP's original motion sought to enjoin sheep grazing on six allotments, and the Salmon River Driveway, within the Payette and Nez Perce National Forests. WWP claims that domestic sheep are spreading a fatal disease to bighorn sheep whose numbers are declining dramatically. The Forest Service responded by agreeing to impose recommendations made to it by the Nez Perce Tribe for the 2007 grazing season. WWP replies that this agreement, if actually implemented, would resolve some of their immediate concerns, and would prompt them to limit their injunctive request to blocking use of the Salmon River Driveway.

At oral argument, the Forest Service represented that it would impose the grazing restrictions – through Amended Operating Instructions – sometime during the next week (*i.e.,* the week of May 7, 2007). Given that commitment by the Forest Service, the Court will construe WWP's motion to be limited to an injunctive request to block use of a portion of the Salmon River Driveway.

2.   **Facts**

Rocky Mountain bighorn sheep were "abundant and widely distributed across the western United States prior to the mid-1800s." *See Forest Service Risk Analysis* at p. 2. However, various factors combined to cause "precipitous declines" in their numbers during the late 1800s and early 1900s. *Id.*

**Memorandum Decision and Order – Page 2**

Idaho's populations suffered similarly, and an attempt was made to reintroduce bighorn sheep from other areas.  This case examines the bighorn sheep populations in the Payette and Nez Perce National Forests.  The two main groups – known as "metapopulations" – exist in the Hells Canyon area and the Salmon River Mountains.  *Id*. at p. 6.

The transplant effort was a joint project involving the States of Idaho, Oregon, and Washington, along with the Foundation for North American Wild Sheep, the Forest Service, and the BLM.  These entities, along with others, formed the Hells Canyon Initiative Committee.

To enlist the support of sheep operations, the Idaho legislature passed a statute directing the Idaho Department of Fish and Game to provide any federal grazing permittee with a letter

> signed by all federal, state and private entities responsible for the transplant [of bighorn sheep into areas they do not now inhabit] stating that the existing sheep or livestock operations in the area of any such bighorn sheep transplant are recognized and that the potential risk, if any, of disease transmission and loss of bighorn sheep when the same invade domestic livestock or sheep operations is accepted [by those entities responsible for the transplant].

*See* Idaho Code § 36-106(e)(5)(D).  Pursuant to this statute, such a letter was provided to the Idaho Wool Growers Association.  The letter states that the Committee "recognizes the existing domestic sheep operations in or adjacent to the

**Memorandum Decision and Order – Page 3**

Hells Canyon complex, on both National Forest and private lands, and accepts the potential risk of disease transmission and loss of bighorn sheep when bighorns invade domestic sheep operations." *See Exhibit D to Amicus Brief of Idaho Wool Growers Association.* One of the signatories to that letter states that the letter was intended to apply to "those portions of the Payette National forest and Nez Perce National Forest within or adjacent to the Hells Canyon complex." *See Declaration of Richmond*, at ¶ 4, p. 2.

While re-introductions of big horns into these two areas raised numbers initially, the die-offs continued, "primarily the result of disease outbreaks." *See Risk Analysis* at p. 2. Bighorn sheep are a species closely related to domestic sheep, and are highly susceptible to their diseases, according to the Forest Service. *Id*. at p. 3. A team of experts assembled by the Forest Service concluded that the scientific literature demonstrates that "clinically healthy bighorn sheep have developed pneumonia and died within days to weeks following contact with clinically healthy domestic sheep." *Id*. They found a broad consensus that "domestic sheep and bighorn sheep must be kept separated in order to maintain healthy bighorn populations." *Id.*[1]

---

[1] Intervenors Shirts Brothers Sheep and Frank Shirts, Jr. and Amicus Idaho Wool Growers Association and Public Lands Council object to this conclusion and point to the opinions of other scientists who believe that bighorns may be dying of pneumonia that is not transmitted by domestic sheep.

**Memorandum Decision and Order – Page 4**

In 2005, the Reviewing Officer for the Chief of the Forest Service found that "the viability of bighorn sheep populations within the Hells Canyon area, and across the Payette [National Forest], appears to be threatened by allowing continued grazing of domestic sheep in or near occupied bighorn sheep habitat . . . . Transmission of disease to bighorn sheep on the Payette [National Forest] that are part of the Hells Canyon population will place the entire Payette [National Forest] population at substantial risk." *See Decision For Appeal* at p. 14. That decision directed the Regional Forester to "do an analysis of bighorn sheep viability" in the Payette National Forest and to "amend the SW Idaho Ecogroup FEIS accordingly." *Id*. at p. 15.

In response, the Forest Service prepared a Risk Analysis that was completed on February 6, 2006. That report assesses the risk levels of sheep-grazing allotments. It rates sheep grazing on the Smith Mountain allotment as posing a "very high risk" for disease transmission because the allotment is so close to bighorn populations. Radio-collared bighorns were detected within the Smith Mountain allotment on 319 occasions between 1997 and 2004. *Id*. at p. 12.

On another four allotments – Marshall Mountain, Curren Hill, Bear Pete, and French Creek – the risk level was "high." *Id*. That risk was due to the allotments' proximity to bighorns and the suitable bighorn habitat on the allotments. The Risk

**Memorandum Decision and Order – Page 5**

Analysis also concluded that a sheep trailing route – known as the Salmon River Driveway – presents a "high risk of disease transmission because of its proximity to occupied bighorn sheep range in Hells Canyon." *Id.* at p. 14.

For the 2007 grazing season, the Forest Service will authorize permittees to use the southern portion of the Salmon River Driveway, beginning within the Smith Mountain allotment at Lick Creek Lookout and continuing southward, out of the allotment. *See Second Declaration of Suzanne C. Rainville* at ¶ 2, p. 2. Sheep will be trailed off during a ten-day period between September 1, 2007, and October 10, 2007. *Id.*

Use of the Driveway is necessary, according to the Forest Service, to trail sheep off of the Smith Mountain and Boulder Creek allotments, where they will be grazing under conditions imposed by the agreement with the Nez Perce Tribe. *Id.* at ¶ 6, p. 3. The Forest Service explains that if the Driveway cannot be used, permittees "would incur additional truck costs and would need additional food for the sheep that would have been using the Driveway." *Id.* at p. 5.

While the Driveway winds through the Smith Mountain allotment – an allotment posing a "very high risk" of disease transmission – the Forest Service asserts that the limited portion of the Driveway being used avoids the high risk areas. More specifically, the Driveway portion cuts through three subunits of the

**Memorandum Decision and Order – Page 6**

allotment that were found not to contribute to the risk. The Risk Analysis broke down the Smith Mountain allotment into subunits corresponding to "6th order hydrological units." *See Risk Analysis* at p. 12. The report concluded that three of those subunits – Lick Creek, Lost Creek, and Upper West Fork Weiser River – "did not contribute to the allotment's overall risk rating." *Id*.

The portion of the Driveway to be used this season runs south along the border between the Lick Creek and Lost Creek subunits, and then continues along the border between the Lick Creek and Upper West Fork Weiser River subunits, before heading south out of the Smith Mountain allotment. Because these subunits have been found to not contribute to the risk, the Forest Service asserts that there is little chance that domestic sheep will encounter bighorns along this stretch of the Driveway.

WWP's expert, Victor Coggins, agrees that the portion of the Driveway within the Smith Mountain allotment south of the Lick Creek Lookout is a lower risk area. *See Coggins Declaration* at p. 2. However, he concludes that "the area further south within the vicinity of Cuddy Mountain . . . has pockets of good bighorn habitat, in close proximity to places within Idaho currently occupied by the Sheep Mountain [bighorn] herd." *Id*. He notes that "numerous bighorn telemetry points from spring, summer, and fall exist in this general area not far from the

**Memorandum Decision and Order – Page 7**

Driveway." *Id*.

Telemetry readings from March of 2007 show that at least six of the collared bighorns were located at the eastern edge of their herd area, about six miles west of the Driveway. *Id*. The record also shows that in past years, mainly for the months of May and June, bighorns had migrated to the Cuddy Mountain area very close to the Driveway. The Forest Service's counsel asserted, without rebuttal, at the oral argument that these close-by sightings involved bighorns from the extirpated McGraw herd, a wandering herd, and that no telemetry sightings have been found in the Cuddy Mountain area adjacent to the Driveway since 2002.

The Forest Service alleges that those bighorns found within six miles of the Driveway in March of 2007 are too far away to be affected. Coggins disagrees, stating that "a bighorn can easily move the five to six miles . . . [to] the Driveway in a matter of hours." *See Coggins Declaration* at p. 4.

**Memorandum Decision and Order – Page 8**

## ANALYSIS

The dispute in this case has narrowed considerably since the original motion was filed. The only remaining issue is whether the Driveway south of the Lick Creek Lookout should be off-limits for sheep trailing in September/October of 2007. There is agreement that the Driveway from the Lookout to the Smith Mountain allotment boundary poses a low risk of disease transmission. The dispute focuses now on that portion of the Driveway outside of the Smith Mountain allotment, near Cuddy Mountain.

The sheep trailing will occur in a ten-day period during September or October of 2007. A crucial issue will be the location of bighorns during that time period. Bighorns move. There is no telling now where they will be in September and October.

This uncertainty factor counsels patience. The Driveway will not be used for 4 months, at the earliest. A hearing in early September would allow the parties to at least attempt to track bighorn movements and provide updated information on locations. The Court has no illusions about the precision of the tracking process. It may be impossible to obtain updated data between now and then. But the effort should be made because it would substantially increase the accuracy of the analysis.

**Memorandum Decision and Order – Page 9**

For all these reasons, the Court will deny that portion of WWP's motion seeking immediate injunctive relief (a TRO) and will reserve ruling on that portion of the motion seeking a preliminary injunction. The preliminary injunction issue shall be resolved following a hearing later this summer.

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motion for TRO and/or preliminary injunction (Docket No. 7) is hereby DENIED IN PART AND RESERVED IN PART. It is denied to the extent it seeks an immediate TRO, and is reserved to the extent it seeks a preliminary injunction.

IT IS FURTHER ORDERED, that counsel arrange a time for a conference call with the Court's Law Clerk Dave Metcalf (208-334-9025) to set a time for the preliminary injunction hearing, which is to be held prior to any use of the Salmon River Driveway.

DATED: **May 11, 2007**

_____
Honorable B. Lynn Winmill
Chief U. S. District Judge

**Memorandum Decision and Order – Page 10**